# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **ROBERT TINKLER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.  07-CV-0259-CVE-FHM** |
| ) | |
| **LEVEL 3 COMMUNICATIONS,** ) | |
| **LLC, and the WILTEL** ) | |
| **COMMUNICATIONS GROUP, INC.** ) | |
| **SEVERANCE PROTECTION PLAN,** ) | |
| ) | |
| **Defendants.** ) | |

## OPINION AND ORDER

Plaintiff filed this action seeking, <u>inter alia</u>, to recover benefits and enforce his rights under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101 <u>et seq</u>. ("ERISA"). Plaintiff challenges the decision of WilTel Communications Group, Inc. Severance Protection Plan ("the Plan") to deny his claim for severance benefits.

### I.

Robert Tinkler ("Tinkler") was hired by WilTel Communications Group, Inc. ("WilTel") in March 1997.  Tinkler was employed as Director of Pricing and Access Services in WilTel's marketing department.  On December 1, 2004, WilTel adopted the Plan to "provide severance pay protections for their [sic] employees."  Admin. Rec. at 41.  The Plan was self-funded by WilTel and was managed by WilTel's board of directors.  The board of directors appointed a Benefits Committee, and the Benefits Committee appointed an Administrative Committee ("AC") to serve as plan administrator.  The Plan provided the AC the following duties and powers:

>   7.02.2   <u>Duties of the Administrative Committee</u>.  The Administrative Committee shall administer this Plan in accordance with its terms and shall have all the powers necessary to carry out such terms.  The Administrative Committee shall execute any certificate, instrument or other written direction on behalf of this Plan and may make any payment on behalf of this Plan.  The Administrative Committee or its delegate shall determine all interpretations of this Plan, and questions concerning its administration and application.

<u>Id</u>. at 51.  Management level participants received severance benefits based on their positions within WilTel.  Tinkler, as a director, would have been entitled to six months of base wages plus six months of target incentive pay if he were approved for severance benefits upon leaving WilTel.  <u>Id</u>. at 56. An employee could receive benefits without being laid off if a "good reason event" occurred.  The Plan defines a "good reason event" as follows:

>   2.01.19   "<u>Good Reason Event</u>" means the occurrence of any of the following events without Employee's consent: (i) a reduction of the aggregate of Employee's Base Wages and Target Incentive opportunity by more than twenty percent (20%), (ii) the relocation of Employee's principal office by more than fifty (50) miles, unless such location is closer to, and within fifty (50) miles of, Employee's primary residence, or (iii) in the case of Management Level Participants, after the occurrence of a Change in Control, a material adverse diminution in Employee's duties or responsibilities; <u>provided</u>, <u>however</u>, that any alteration in Employee's reporting responsibilities or title shall not be deemed a diminution of Employee's duties or responsibilities so long as Employee continues to perform, in the aggregate, materially the same functions and responsibilities for the Company.

<u>Id</u>. at 44.  Any employee who intended to resign based on a good reason event was required to notify the employer at least 30 days before the resignation was effective, and the employer had 30 days to "cure" the material adverse diminution in the employee's duties if the employer found that such a diminution had occurred.  The Plan bound "any successor to [WilTel] which becomes such on or after a Change in Control has occurred, in the same manner and to the same extent that [WilTel] would be obligated under this Plan if such Change in Control had not taken place."  <u>Id</u>. at 49.

The Summary Plan Description ("SPD") is a separate document that provides a summary of the Plan for the benefit of Plan participants but, should the SPD conflict with the terms of the Plan, the language in the Plan governs. Id. at 11. The SPD states:

> The Plan Administrator will have the power, including, without limitation, discretionary power, to make all determinations that the Plan requires for its administration, and to construe and interpret the Plan whenever necessary to carry out its intent and purpose and to facilitate its administration, including, but not by way of limitation, the discretion to grant or to deny claims for benefits under the Plan.

Id. Plaintiff notes that the language of the Plan does not specifically describe the AC's powers as discretionary, and he claims that the SPD conflicts with the Plan as to the AC's discretionary authority to interpret the Plan and authorize awards of benefits.

On July 1, 2005, Tinkler and WilTel executed an agreement that would provide Tinkler a $75,000 retention award if he remained an employee of WilTel or a successor company until June 30, 2007. The retention award was not "considered compensation for the purposes of the Company's pension, supplement pension, welfare benefit plans, programs and arrangements, including, but not limited to, the WilTel Communications Investment Plan. Id. at 58.

Level 3 Communications, LLC ("Level 3") acquired WilTel in December 2005 and Level 3 retained Tinkler as an employee. On January 26, 2006, Tinkler was notified that he would be serving in a transitional role as Director, Metro Services, for Level 3 and his salary would be increased from $133,704 to $140,000 per year. Tinkler was also eligible for bonus target incentive pay in an amount up to 25 percent of his annual salary.

On February 17, 2006, Tinkler sent an e-mail to his supervisor, Glenn Russo ("Russo"), and a vice president of Level 3's human resources department, Blake Isom ("Isom"), notifiying Level 3 that Tinkler intended to resign based on a good reason event. Tinkler cited "a material adverse

3

diminution" of his duties and responsibilities as the good reason event, because he felt that his position as director of metro services had severely diminished his responsibilities.  Id. at 63. However, he did not identify any specific job duties that had been removed from him nor did he provide any evidence of such with his notice.  Isom forwarded Tinkler's e-mail to Katherine Resler ("Resler"), also a vice president of human resources, and Isom asked Resler what "details" Tinkler would need to provide to support his notice.[1]  Isom sent a second e-mail to Resler stating that Tinkler was a "future dated employee" and he believed that Level 3 would need Tinkler for approximately 3 months.  Id. at 20.  Isom states that he conveyed this information to Tinkler and Tinkler still intended to pursue his notice of good reason event.  On behalf of the AC, Melissa Gasser ("Gasser") asked Tinkler to submit a memorandum detailing the basis for his alleged good reason event.

On March 2, 2006, Tinkler e-mailed a memorandum to Gasser and Isom describing his responsibilities with WilTel and his allegations that his position as director of metro services at Level 3 constituted a material adverse diminution.  Tinkler identified five distinct areas of responsibility during his employment with WilTel: (1) pricing administration; (2) pricing automation; (3) reporting; (4) access services; and (5) access management.  Id. at 66-67.  He claimed that two-thirds of his responsibilities with WilTel had been moved to other departments within Level

---

[1]      Tinkler suggests that Isom's quick referral of the matter to Resler creates an inference that Level 3 was looking for a way to deny Tinkler's claim for severance benefits.  Defendants dispute Tinkler's interpretation of Isom's e-mail, and state that Isom could have had legitimate reasons for contacting Resler.  From the plain language of Isom's e-mail, it is apparent that he contacted Resler to determine what additional information Tinkler would need to submit.  Tinkler's notice simply stated that "a Good Reason Event has occurred pursuant to 2.01.19 of [the Plan]," but he did not provide any factual support with his notice. Id. at 63.  Contrary to plaintiff's assertion, Isom's belief that more information would be required was reasonable, and the Court does not find that Isom's referral of the matter to the AC creates an inference that Level 3 was looking for a way to deny Tinkler's claim.

3.  Tinkler stated that he had a staff of 34 with WilTel, but his staff had been cut to 11 by Level 3. He acknowledged that Level 3 was a larger company than WilTel, because WilTel had approximately 1,800 employees while Level 3 had about 4,000 employees.  Even accounting for the differences in the size of the companies, Tinkler felt that Level 3 had demoted him to a front-line manager when he was previously an upper-level manager with significant responsibilities.  Gasser informed Tinkler that she received his memorandum, but she did not believe that the AC would "have a clear idea of [Tinkler's] current job responsibilities and the difference between [his] previous position."  Id. at 26.

In response to plaintiff's memorandum, Level 3, through Russo, notified Tinkler that Level 3 disagreed with his notice of good reason event and Russo sent Tinkler a letter on March 10, 2006, explaining Tinkler's duties with Level 3.  Russo stated that Tinkler had not fully assimilated into his new position, and described his duties, even if Tinkler was not fully aware of his duties, as follows:

   ○  Lead M&A [merger and acquisition] business evaluations of metro service providers;

   ○  Lead cross-functional outside plan of expansion process improvements;

   ○  Provide leadership and direction in order to drive the business and revenue, opportunities for our Metro Services product line;

   ○  Responsible for profit and loss management, pricing, portfolio positioning and ongoing life-cycle management in order to achieve both company and product revenue and margin goals;

   ○  Develop the ideas for new products, define the product/service and its market, develop the market strategy, and present the business case supporting the product/service;

   ○  Provide business leadership for our Access Product definition, management and optimizations; and

&#9702;      Provide business leadership to M&A integration of metro service providers.

Id. at 70.  Russo also identified two new responsibilities that Tinkler did not have in his position with WilTel:

&#9702;      Manage third party dark fiber relationships to support of network expansions and customer network solutions; and

&#9702;      Develop and own a cross-functional process to create corporate statistics for determining the number of markets and on-net locations we serve and the number of metro fiber miles we have.  This includes responsibility for approving and substantiating external claims in coordination with investor relations.

Id. at 70-71.  Russo advised Tinkler to reconsider his decision to resign and, if he did continue with the resignation process, his request for severance benefits would be denied.

Tinkler responded to Russo's letter on March 13, 2006, and stated his disagreement with Level 3's rejection of his notice of good reason event.  Tinkler requested additional information concerning Russo's statement that Tinkler had responsibility to "lead cross-functional outside plan of expansion process improvements," and he also informed Russo that he would submit a more detailed response to Russo's letter.  Id. at 73.  Russo notified Tinkler that Russo's letter contained a typographical error, and his letter should have stated that Tinkler had responsibility to "[l]ead cross-functional process improvements for outside plant expansions."  Id. at 24.  Tinkler submitted his full response to Russo's letter on March 16, 2006, and he asked Level 3 to reconsider his eligibility for severance benefits based on a good reason event.  Tinkler's resignation from Level 3 was effective on March 17, 2006.  Level 3 did not reconsider its decision and Tinkler was not awarded severance benefits upon his resignation.

Following his resignation, Tinkler obtained legal counsel and, on March 31, 2006, his counsel contacted Level 3 to determine how to pursue a claim for severance benefits under the Plan.

Level 3's counsel, Lisa Hogan ("Hogan"), responded to Tinkler's letter, and advised him how to proceed with his claim. On May 1, 2006, Tinkler filed a formal claim for severance benefits with the AC. Tinkler reasserted his argument that his position as director of metro services reduced his responsibilities by approximately two-thirds from his position with WilTel, and he provided over 140 pages of documentation to support his claim.[2] He alleged that his former responsibilities for pricing automation and administration and preparation of market reports had been moved into other departments of Level 3, and this accounted for the primary loss of duties and responsibilities in his new position. He claimed that his budgeted revenue for Level 3 during 2006 was $82.9 million, but his budgeted revenue for 2005 with WilTel was $114.7 million. Id. at 35. Tinkler also felt that the additional job duties cited by Russo were insufficient to offset the loss of responsibility in his position with Level 3.

Resler investigated Tinkler's claim and, to determine the scope of Tinkler's duties with WilTel and Level 3, she interviewed Russo, Ed McLauglin ("McLaughlin"), and Paul Savill ("Savill").[3] McLaughlin was the General Vice President of Operations at Level 3 and the former head of operations at WilTel. Savill was a vice president at WilTel and he worked with Tinkler at WilTel and Level 3. The AC, through Resler, issued its decision denying Tinkler's claim for

---

[2]     Plaintiff also argued that Level 3 failed to cure the good reason event. However, Level 3 did not find that a good reason event had occurred, and claimed that its duty to cure did not arise.

[3]     Plaintiff claims that Resler's notes suggest that she was receiving instructions from Hogan when preparing the AC's decision. Resler's notes include the following notation: "Term LH = don't put in - left in (this may ⌂) - wouldn't includ." Id. at 197. Although this notation is cryptic, it appears below Resler's note that received revenue was $82 million, and it appears Resler was determining what revenue figures should be included in a calculation of Tinkler's budget at Level 3. Even if Resler had contacted Hogan in connection with Tinkler's claim, this notation is insufficient to support plaintiff's allegation that Resler was "receiving instructions" as to how to deny Tinkler's claim. Dkt. # 40, at 11.

severance benefits on July 28, 2006.  The AC provided three bases to deny his claim: (1) Tinkler was not an eligible employee under section 2.01.14 of the Plan; (2) Level 3 offered Tinkler a comparable position and under section 4.02 of the Plan, he was not entitled to receive severance benefits; and (3) Tinkler did not suffer a material adverse diminution in his duties and responsibilities.  Admin. Rec. at 211-17.  The AC acknowledged that plaintiff's duties at Level 3 were limited in comparison with his position at WilTel, but found that "Level 3 is a much larger organization than WilTel, so there is necessarily more specialization of roles and tasks." Id. at 216. The difference in Tinkler's duties with WilTel and Level 3 was characterized as a "breadth v. depth" issue.  Id.  For example, Russo described Tinkler's role with Level 3 as "much deeper and included more of an ownership focus whereas his role at WilTel was more in an advisory capacity."  Id.  Even though plaintiff had a more limited scope of duties at Level 3, the AC found that he had a higher level of responsibility and he did not suffer a material adverse diminution of responsibilities or duties.

In order to prepare an appeal, Tinkler requested and received a copy of the claim file.  He also requested permission to contact three former Level 3 employees in connection with his appeal.[4] Tinkler filed his appeal on September 25, 2006, but the AC had not notified Tinkler of its decision concerning his request to interview Tomae, McAndrews, and Slick.  The AC was uncertain that the former employees would have relevant information but, on October 31, 2006, the AC agreed to

---

[4]     Tinkler requested permission to conduct these interviews because he believed that the employees, Matt Slick ("Slick"), Tony Tomae ("Tomae"), and Mike McAndrews ("McAndrews"), had executed confidentiality agreements with Level 3 as part of their severance packages.  Tomae was senior vice president of marketing for WilTel, but he decided not to seek employment with Level 3.  McAndrew was the Director of Product Management for IP Services at WilTel.  Slick could not be located for an interview and plaintiff does not identify his position with WilTel or Level 3.

permit the interviews as long as a representative of the AC conducted the interviews. Tinkler would be allowed to submit a list of questions for the interviews and he would receive a transcript and notes from each interview. Tinkler submitted a list of questions for the AC's interviews with Tomae and McAndrews, and the AC selected Tadari Ahles, a management level employee of Level 3, to conduct the interviews. After the interviews were completed, Level 3 requested an extension of time to consider Tinkler's appeal.

On January 12, 2007, the AC met to discuss Tinkler's appeal, but the AC was concerned that it did not have sufficient time review all of the evidence before making its decision. Specifically, the AC wanted to perform a comparison of Tinkler's positions with WilTel and Level 3 based on new information from its interviews with Tomae and McAndrews. Id. at 307. The AC reconvened on January 19, 2007 and Hogan, in her capacity as legal liaison to the AC, was present at the meeting. Hogan reminded the AC of its fiduciary obligation to Plan participants, and "any doubts or close calls" were to be resolved in Tinkler's favor. Id. at 308. The AC considered how Tinkler's former position evolved after he resigned, in part because Tinkler occupied the position for such a short time. The minutes from the meeting show that:

> [t]he members discussed that (1) its focus was not on whether Mr. Tinkler had been a good employee with significant responsibilities at Wiltel -- it was presumed this was the case, which was why Level 3 wanted him to accept the position and why he was offered an increase in salary; (2) there was no reason to dispute any facts stated by Mr. Tinkler or his supporting witnesses -- for purposes of this determination, they could all be presumed to be true; (3) the essence of this dispute is that the role at Level 3, a much larger company doing a much more significant volume of work, was going to be narrower, but deeper than his role was at a smaller company, where fewer employees were spread across a broader range; and (4) the focus had to be on the language in the Plan and whether their [sic] was a "material adverse diminution" in his duties or responsibilities.

Id. at 309. Hogan left the meeting while the AC conferred about its decision.

On January 24, 2007, the AC notified Tinkler of its decision to deny his appeal.  The AC

acknowledged that Tinkler was an eligible employee under the Plan and that he sought severance

benefits based on a good reason event.[5]  Id. at 315.  The AC provided the following explanation for

its decision to deny Tinkler's appeal:

> The members discussed that a Change in Control provision such as that included in
> the Plan is not unusual and is obviously intended to address a situation, such as exists
> here, where one company is acquired or merged with another and job functions are
> altered as a result.  It would rarely be the case that an affected employee's position
> would remain exactly the same, especially if the new company is much larger.  It
> would not be reasonable to expect that someone coming from a smaller company,
> dealing with smaller revenues and smaller transactions, would become part of a
> larger, more complex organization and have the exact same role because that would
> mean that he would be responsible for the same duties for an exponentially larger
> organization.  After much discussion and comparison of the two positions, the
> Administrative Committee's conclusion was that Mr. Tinkler's position at Level 3
> was a significant, deeper but narrower role involving significantly more revenue, at
> a higher salary, than his role at WilTel, which was broader, involved less revenue,
> at a lower salary.

Id. at 317.  The AC informed Tinkler that he had exhausted his administrative remedies under the

Plan and he had the right to file an ERISA claim challenging the AC's decision to deny his claim

for severance benefits, which he has done.[6]

## II.

As a preliminary matter the Court must establish the proper standard of review for plaintiff's

ERISA claim.  Plaintiff asks the Court to review his ERISA brief under Fed. R. Civ. P. 56 and treat

his brief as a motion for summary judgment.  Defendants do not address this issue in their discussion

---

[5]    In its initial decision, the AC denied Tinkler's claim, in part, on the basis that he was not an
eligible employee.  Its decision on Tinkler's appeal specifically states that Tinkler was an
eligible employee and, although the AC does not reference its earlier decision, it appears that
the AC reversed its decision on this issue.  Id. at 315.

[6]    Plaintiff also brings claims for breach of contract and "tortious" breach of contract based on
the retention award agreement that are not considered herein.

of the standard of review for plaintiff's ERISA claim.  In addition to the applicability of Fed. R. Civ.

P. 56, this Court must establish the appropriate standard of review for plaintiff's ERISA claim under

applicable Supreme Court and Tenth Circuit precedent.

Summary Judgment

Plaintiff asserts that this Court is required to treat his ERISA brief as a motion for summary

judgment under Fed. R. Civ. P. 56.  He cites Graham v. Hartford Life and Accident Insurance Co.,

501 F.3d 1153 (10th Cir. 2007), to support his argument that Fed. R. Civ. P. 56 applies to this

Court's review of his ERISA claim.  In Graham, the Tenth Circuit, in a footnote, stated:

> Even though ERISA claims have a distinct standard of review, we expect a district
> court's resolution of those claims to comport with the Federal Rules of Civil
> Procedure, which typically would be to treat them as a motion for summary
> judgment.

Id. at 1155 n.1 (internal citations omitted).  However, Graham did not actually apply a summary

judgment standard of review to the plaintiff's ERISA claim, and the Tenth Circuit's footnote

concerning the proper application of the Federal Rules of Civil Procedure is simply dicta.  Without

any clear guidance from the Tenth Circuit on this issue, this Court must determine the procedural

posture of plaintiff's ERISA briefing under the Federal Rules of Civil Procedure.

Under the standard of review for ERISA claims established by the Tenth Circuit in Fought

v. Unum Life Insurance Co. of America, 379 F.3d 997 (10th Cir. 2004), "federal courts are limited

to the 'administrative record'-the materials compiled by the administrator in the course of making

his decision." Id. at 1003 (citing Hall v. Unum Life Ins. Co. of America, 300 F.3d 1197, 1201 (10th

Cir. 2002)).  Discovery outside of the administrative record is generally not permitted, because

evidence that was not considered by the plan administrator is not relevant to a district court's review

of an ERISA claim.  Banuelos v. Constr. Laborers' Trust Funds for Southern California, 382 F.3d

897, 904 (9th Cir. 2004); Wilkins v. Baptist Healthcare System, Inc., 150 F.3d 609, 618 (6th Cir. 1998).  In ERISA cases when the benefits plan provides discretion to a plan administrator, a reviewing court must does not consider the evidence under a de novo standard of review but, rather, a court reviews the plan administrator's decision to determine if the decision is supported by substantial evidence.  Geddes v. United Staffing Alliance Employee Med. Plan, 469 F.3d 919, 923 (10th Cir. 2006); Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 630 (10th Cir. 2003).

In contrast, the summary judgment process focuses on the existence of genuine issues of material fact for trial.  The Federal Rules of Civil Procedure permit a district court to consider the "pleadings, the discovery and disclosure materials on file, and any affidavits" to determine if any genuine issue of material facts exists that must be resolved by the finder of fact.  Fed. R. Civ. P. 56(c).  Summary judgment is primarily a procedural tool allowing a district court to dispose of a case when the lack of factual disputes make a trial unnecessary.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ."); Berry v. T-Mobile USA, Inc., 490 F.3d 1211, 1216 (10th Cir. 2007) ("The purpose of a summary judgment motion is to assess whether a trial is necessary."); White v. York Int'l Corp., 45 F.3d 357, 360 (10th Cir. 1995) ("The very purpose of a summary judgment action is to determine whether trial is necessary.").  ERISA cases are replete with factual disputes and, in order to treat plaintiff's brief as a motion for summary judgment, the Court would have to disregard the plain language of Rule 56.  See Wilkins, 150 F.3d at 619 ("the summary judgment procedures set forth in Rule 56 are inapposite to ERISA actions and thus should not be utilized in their disposition"); Jones-Stott v. Kemper Lumbermans Mut. Cas. Co., 2007 WL 470474 (E.D. Mich. Feb. 7, 2007) (finding Rule 56 inapplicable to ERISA cases); Neumann v. Prudential Ins. Co. of America, 367 F. Supp. 2d 969 (E.D. Va. 2005) (Rule 56 applies

to ERISA cases when a district court applies a <u>de</u> <u>novo</u> standard of review, but it would "make little

sense" to apply summary judgment standards when reviewing an ERISA claim under an arbitrary

and capricious standard of review).

As the courts in <u>Wilkins</u> and <u>Neumann</u> discussed, it would be equally inappropriate to hold

a bench trial in cases where a claimant is challenging the denial of benefits under an ERISA plan.

In <u>Wilkins</u>, the Sixth Circuit found that requiring district courts to hold bench trials in ERISA cases

would encourage the introduction of evidence outside of the administrative record and it would

contravene "ERISA's goal of providing an inexpensive and expeditious method of resolving benefits

disputes." <u>Wilkins</u>, 150 F.3d at 618.  If a district court were to hold a bench trial, the Court would

be required to resolve disputed questions of fact and issue findings of fact and conclusions of law.

Fed. R. Civ. P. 52(a).  This result would be inapposite with the Supreme Court's decision in

<u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989), and the standard of review for ERISA

cases enunciated by the Tenth Circuit in <u>Fought</u>.

In order to reconcile the facial incompatibility of Rule 56 and the standard of review for

ERISA claims set forth in <u>Fought</u>, the Court finds that the administrative record should be reviewed

and judgment should be entered pursuant to Fed. R. Civ. P. 54 and 58.  As noted in <u>Fought</u>, the

Court's review is limited to the material contained in the administrative record and the Court must

determine the appropriate level of deference, if any, to the plan administrator's decision.  Once the

appropriate level of deference is established, the Court must review the entire administrative record

to determine if substantial evidence supports the plan administrator's decision.  The existence of a

genuine issue of material fact does not preclude a district court from entering judgment on an ERISA

claim.  Rule 56 is facially inapplicable.  <u>See</u>  <u>Panther v. Synthes (U.S.A.)</u>, 380 F. Supp. 2d 1198,

1207 (D. Kan. 2005);  <u>Clausen v. Standard Ins. Co.</u>, 961 F. Supp. 1446, 1455 (D. Colo. 1997).  A

district court's review of an ERISA claim more closely resembles appellate review rather than a ruling on a motion for summary judgment under Fed. R. Civ. P. 56, and, thus, the Court is not ignoring the Federal Rules of Civil Procedure by entering judgment pursuant to Rules 54 and 58 rather than Rule 56.  See Rappa v. Connecticut Gen. Life Ins. Co., 2007 WL 4373949, *1 (E.D.N.Y. Dec. 11, 2007); Panther, 380 F. Supp. 2d at 1207.

ERISA Standard of Review

As a plan beneficiary, plaintiff has the right to federal court review of benefit denials and terminations under ERISA.   "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans."   Firestone Tire & Rubber Co., 489 U.S. at 113. Specifically, 29 U.S.C. § 1132(a)(1)(b) grants plaintiff the right "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  The default standard of review is de novo.  However, when a plan gives the claims administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of a plan, a challenge under section 1132(a)(1)(B) is to be reviewed under an arbitrary and capricious standard.  See Firestone, 489 U.S. at 115 (courts must apply the appropriate standard "regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest.  Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.").

Under the two-tier "sliding scale" approach adopted by the Tenth Circuit, a "reduction in deference is appropriate" where there is an inherent or proven conflict of interest.  Fought, 379 F.3d at 1006.   If plaintiff shows an inherent or proven conflict of interest, deference to the decision is

14

reduced and the burden shifts to the plan administrator or fiduciary to prove "that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence." Id.   However, if the plan administrator operates under a "standard" conflict of interest, the conflict of interest is simply "one factor in determining whether the plan administrator's denial of . . . benefits to plaintiff was arbitrary and capricious." Id. at 1005. When an employer establishes a self-funded benefits plan and serves as the plan administrator or fiduciary, this is a standard conflict of interest rather than an inherent conflict of interest. Wolberg v. AT&T Broadband Pension Plan, 123 Fed. Appx. 840, 845 (10th Cir. Jan 6, 2005)[7]; Slocum v. UNUM Life Ins. Co. of America, 2007 WL 2461690, *4 n.1 (D. Kan. Aug. 28, 2007).  To determine the severity of the conflict of interest, a court should consider four factors:

> (1) the plan is self-funded; (2) the company funding the plan appointed and compensated the plan administrator; (3) the plan administrator's performance reviews or level of compensation were linked to the denial of benefits; and (4) the provision of benefits had a significant economic impact on the company administering the plan.

Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan, 379 F.3d 1168, 1175 (10th Cir. 2004) (quoting Kimber v. Thiolkol, 196 F.3d 1092, 1098 (10th Cir. 1999)).

In a conflict of interest situation, the determinative inquiry is whether the administrator's decision was supported by substantial evidence.  "'Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].'  Substantial evidence requires 'more than a scintilla but less than a preponderance.'"  Sandoval v. Aetna Life & Cas. Inc. Co., 967 F.2d 377, 382 (10th Cir. 1992)

---

[7]     Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

(citations omitted). "The district court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest." Allison v. Unum Life Ins. Co. of America, 381 F.3d 1015, 1022 (10th Cir. 2004). The Court considers the record as a whole, but it considers only that information available to the plan administrator at the time the decision was made. Hall v. Unum Life Ins. Co. of America, 300 F.3d 1197, 1201 (10th Cir. 2002); Chambers v. Family Health Plan Corp., 100 F.3d 818, 823 (10th Cir. 1996) ("The reviewing court may consider only the evidence that the administrators themselves considered."). The Court must "take into account whatever in the record fairly detracts from the weight of the evidence in support of the administrator's decision." Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994) (internal citations and quotation marks omitted). The Court gives less deference to an administrator's conclusions if the administrator fails to gather or examine relevant evidence. See Caldwell v. Life Ins. Co. of N. America, 287 F.3d 1276, 1282 (10th Cir. 2002). Yet, the Court "will not set aside a benefit decision if it was based on a reasonable interpretation of the plan's terms and was made in good faith." Trujillo v. Cyprus Amax Minerals Co., Ret. Plan Comm., 203 F.3d 733, 736 (10th Cir. 2000).

Plaintiff asserts that the Plan does not contain discretionary language, and his claim should be reviewed under a de novo standard. According to plaintiff, the Plan does not actually use the word "discretion" when describing the AC's review of a claim and, therefore, the Plan does not vest the AC with discretionary authority when making benefits determinations. However, plaintiff oversimplifies the issue and his argument ignores language in the Plan and the SPD conferring discretion upon the AC when interpreting the Plan and authorizing the payment of benefits. There are no "magic words" that a benefits plan must use to confer discretion upon a plan administrator

16

under ERISA as long as the plan gives the plan administrator the "'power to construe disputed or doubtful terms' in the plan." <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F.3d 955, 963 (9th Cir. 2006) (quoting <u>Firestone</u>, 489 U.S. at 111).  In this case, the Plan specifically provides the AC authority to "determine all interpretations of this Plan, and questions concerning its administration and application."  Admin. Rec. at 51.  In addition, the SPD provides:

> The Plan Administrator will have the power, including, without limitation, discretionary power, to make all determinations that the Plan requires for its administration, and to construe and interpret the Plan whenever necessary to carry out its intent and purpose and to facilitate its administration, including, but not by way of limitation, the discretion to grant or to deny claims for benefits under the Plan.

<u>Id</u>. at 11.  The SPD is part of the Plan documents and it does not conflict with the implied discretionary authority vested in the AC by the terms of the Plan.  <u>See</u> <u>Chiles v. Ceridian Corp.</u>, 95 F.3d 1505, 1515 (10th Cir. 1996) ("An SPD is considered part of the plan documents required by ERISA.").  The Court finds that the Plan provides the AC discretion to interpret the Plan, and the proper standard of review in this case is the "arbitrary and capricious" standard discussed by the Tenth Circuit in <u>Fought</u>.

Plaintiff argues that the Court's level of deference should be reduced because (1) an inherent conflict of interest exists; (2) a serious conflict of interest exists; and (3) the review process was fraught with serious procedural irregularities.  Although the Plan is self-funded and the AC is composed of Level 3 employees, this does not constitute an inherent conflict of interest.  <u>Pitman v. Blue Cross & Blue Shield of Oklahoma</u>, 217 F.3d 1291, 1296 n.4 (10th Cir. 2000).  Plaintiff must show that the AC had a serious or proven conflict of interest under the four <u>Fought</u> factors.  The parties do not dispute that the first two factors are present - that the Plan is self-funded and that Level 3 appointed the AC.  However, the Court finds no evidence in the administrative record that

the AC's performance reviews or compensation were linked to its benefits decisions or that the payment of benefits had a significant economic impact on Level 3.  Plaintiff infers that Level 3 had a financial incentive to deny his claim for severance benefits, because Level 3 incurred a $790 million loss during the 2006 fiscal year and it had already paid $13 million in severance benefits during 2006.[8]  However, there is no evidence that the AC considered this when it made its decision and plaintiff has not proven a serious conflict of interest.  Therefore, this is not a basis for the Court to reduce its level of deference to the AC's decision denying plaintiff's benefits claim.

Plaintiff asserts that serious procedural irregularities occurred during the review process, and the Court should reduce the level of deference to the plan administrator's decision under the arbitrary and capricious standard of review.  He argues that Resler handled the AC's initial denial of his claim and participated in the review of his appeal, and Resler's participation in both levels of review prejudiced plaintiff.  However, the AC's notes show that it engaged in a thorough review of his claim and that it requested additional time to consider new evidence submitted by plaintiff during the appeal process.  Resler's participation in the review of plaintiff's initial claim and his appeal, even if it is a procedural irregularity, is not a serious procedural irregularity, because there is no evidence that she was biased against plaintiff.[9]  The AC conducted interviews of additional

---

[8]     The AC's notes indicate that it viewed Tinkler's claim as a close call, and considered paying his claim to avoid expending further administrative resources on his claim.  Admin. Rec. at 308 ("There was discussion about the fact that this had been and continued to be a time and resource-consuming undertaking and that it would be easier just to pay him.").  However, the AC agreed that this would show a disregard for its fiduciary obligation to all Plan participants.  Whether or not the AC's decision is upheld, it is clear that the AC did not consider Level 3's financial loss as a factor and, in fact, it does not appear that the AC had any reluctance to award plaintiff benefits for purely financial reasons.

[9]     In addition, the AC did not give any deference to Resler's initial decision and, although Level 3 initially denied Tinkler's claim, it appears the AC started from a clean slate when reviewing Tinkler's appeal.  Id. at 307.

18

witnesses, as requested by plaintiff, and the there is no indication that the AC ignored or refused to gather relevant evidence. Plaintiff's assertion that the AC was "receiving instructions" from Hogan is nothing more than unsupported speculation, because the administrative record shows that Hogan was not present when the AC made its final decision on plaintiff's benefits claim.[10] Plaintiff also argues that defendants resisted discovery concerning a potential conflict of interest. However, plaintiff's request to conduct discovery on the conflict of interest issue was denied by the magistrate judge, and plaintiff did not appeal the magistrate judge's decision. The Court will not use defendants' opposition to a discovery request to reduce the standard of review when the magistrate judge considered the defendants' objection to be reasonable. Plaintiff received a full and fair review of his claim for severance benefits, and the Court will not reduce the level of deference based on a serious procedural irregularity.

In this case, the conflict of interest is simply a standard conflict of interest that must be considered as a factor in the Court's review of plaintiff's ERISA claim, but the burden does not shift to defendants to prove the reasonableness of the Plan's decision to deny plaintiff's benefits claim. When applying the arbitrary and capricious standard, a plan administrator's decision will be upheld "so long as it is predicated on a reasoned basis." Adamson v. Unum Life Ins. Co. of America, 455 F.3d 1209, 1212 (10th Cir. 2006). If a court finds that a plan administrator's decision "resides 'somewhere on a continuum of reasonableness-even if on the low end," the decision must be upheld. Id. (quoting Kimber, 196 F.3d at 1098). Regardless of the level of deference given to the Plan's

---

[10]     Although Hogan served as liaison to the AC, the AC's minutes indicate that Hogan was not present when the final decision on plaintiff's claim was made. It was appropriate for the AC, comprised of Level 3 employees, to seek legal guidance on ERISA procedures when considering plaintiff's claim. The mere fact that the AC requested legal assistance from Hogan does not create an inference that Hogan was suggesting ways to deny plaintiff's claim.

decision, the Court must consider the entire administrative record to determine if the Plan's decision is supported by substantial evidence, and "must 'take into account whatever in the record fairly detracts from its weight." Caldwell, 287 F.3d at 1283.

**III.**

Plaintiff argues that the AC's decision to deny his claim for severance benefits was arbitrary and capricious, because the AC's "reasoning [was] flawed and not based on substantial evidence." Dkt. # 40, at 32. He claims that the AC's decision was based exclusively on the fact that Level 3 was a larger company than WilTel, and the AC's conclusion that plaintiff's position with Level 3 was narrower but deeper is simply speculation. Defendants argue that the AC's decision was correct under any standard of review because plaintiff has not produced any evidence that he suffered a material adverse diminution of his duties. Under the arbitrary and capricious standard of review, defendants argue that the Court must defer to the AC's decision, because the AC's decision was supported by substantial evidence.

Plaintiff asserts that he had five areas of responsibility during his employment with WilTel: (1) pricing administration; (2) pricing automation; (3) reporting; (4) access services; and (5) access management. Admin. Rec. at 66-67. He argues that his pricing automation and pricing administration duties were placed under Level 3's Commercial Services Group and his market reporting function was moved into Level 3's Management Information Group. Id. at 33, 66. Plaintiff asserts that, before Level 3's acquisition of WilTel, he could authorize capital spending projects of $1 to $2 million and that he reported directly to WilTel's chief financial officer on pricing matters. Id. at 291. He admits that his access services and access management services were largely unchanged with Level 3. Id. at 33, 66-67. Plaintiff viewed his new position as a demotion,

20

in part, because he went from managing a staff of 34 to a staff of 11 and his operating budget was

reduced by approximately $30 million.  Id. at 33, 67.  In terms of corporate structure, he asserts that

he was in the top 3 percent of management with WilTel but, in his position with Level 3, he was

within the top 14 percent of management.  Id. at 67.  Plaintiff claims that the AC presumed as true

all facts by alleged by plaintiff and his supporting witnesses and, based on this presumption, there

was no reasonable basis for the AC to deny his claim for severance benefits.[11]  Id. at 309.

Defendants admit that certain responsibilities were removed from plaintiff's control, but

assert that plaintiff retained the same or greater level of overall responsibility.  Defendants highlight

five new or increased areas of responsibility in plaintiff's position with Level 3:

> •  While certain pricing functions were removed from Plaintiff's direct supervision
> at Level 3, he had greater control over the setting parameters for pricing decisions
> at Level 3 than at WilTel.  He also still retained the ability to direct the activities of
> the other group performing the pricing functions, even though they were no longer
> directly in his reporting structure.

> • With regard to profit and loss responsibility, Plaintiff's responsibilities were "more
> in depth at Level 3" because he had responsibility for "every aspect of cost structure"
> and was "more controlling" versus being responsible for only gross margin and not
> necessarily all of the expense management at WilTel.

> •  Plaintiff's [merger and acquisition] role at Level 3 was clearly far more significant
> than it had been at WilTel.

---

[11]     Plaintiff also argues that the AC considered the development of plaintiff's position with
Level 3 after he resigned, and this constitutes a clear violation of the Plan.  Although it
appears that the AC discussed this issue, the AC did not rely on this as a basis to deny
plaintiff's initial claim or appeal.  See id. at 211-18, 315-18.  Because the AC did not
expressly rely on this evidence in its written denials of plaintiff's claim for severance
benefits, the Court finds that it would be inappropriate to consider this evidence when
reviewing plaintiff's ERISA claim. Therefore, the Court will consider the duties of plaintiff's
position of director of metro services at the time he resigned.

- Plaintiff's responsibilities, particularly with regard to setting pricing parameters, were more ownership focused at Level 3 than they were at WilTel.

- Plaintiff was assigned the new/job responsibility of leading cross-functional process improvements for outside plant expansions, which involved tackling a complex problem touching several organizations.

Dkt. # 47, at 31.  Defendants argue that it is logical that plaintiff would have a more limited role at Level 3, because Level 3 is a larger organization that needs more specialized employees. Defendants assert that plaintiff's position at Level 3 would have been unmanageable if he had responsibility over the same areas as he had at WilTel, because Level 3 handled more contracts dealing with significantly greater amounts of money.  Defendants also suggest that plaintiff was dissatisfied following Level 3's acquisition of WilTel, because Russo offered to move plaintiff into another job after receiving plaintiff's notice of good reason event.  However, plaintiff refused the opportunity to look for another position within Level 3 and he "asked to go" even if Level 3 were to offer him a new job. Id. at 199.  Defendants also point out that plaintiff received a pay raise when he began working for Level 3, and it is unlikely that Level 3 would have increased his salary but removed most of his duties.

The Court has reviewed the entire administrative record, and finds that administrative record does not contain sufficient evidence to support many of defendants' factual assertions.  Likewise, many of plaintiff's assertions about his duties at Level 3 are also unsupported by any evidence other than his own statements.  After reviewing the entire administrative record, the Court finds that the administrative record contains the following evidence:

- letters and e-mails concerning plaintiff's notice of good reason event. Id. at 19-29, 62-75, 137.
- plaintiff's initial claim to the AC following his resignation. Id. at 30-39.

- the SPD and the Plan.  <u>Id</u>. at 1-14, 40-61.

- organizational charts of WilTel from 2005.  <u>Id</u>. at 76.

- job description for WilTel's pricing automation team.  <u>Id</u>. at 78-83.

- plaintiff's 2004 and 2005 performance evaluations from WilTel.  <u>Id</u>. at 85-98; 130-35.

- slides from presentations given by plaintiff at WilTel.  <u>Id</u>. at 101-11, 139-62, 169-76.

- Level 3 organizational chart.  <u>Id</u>. at 115-28.

- revenue forecast for Level 3's Metro Services department in January 2006.  <u>Id</u>. at 164-67.

- description of "Access Roles and Responsibilities" at Level 3.  <u>Id</u>. at 177.

- internal Level 3 e-mails concerning a project assigned to plaintiff. Id. at 182-83.

- Resler's handwritten notes taken during her review of plaintiff's initial claim.  <u>Id</u>. at 195-200.

- letter from Resler to plaintiff denying his initial claim.  <u>Id</u>. at 203-10.

- letters from plaintiff's counsel to AC concerning interviews of additional WilTel employees for plaintiff's appeal.  <u>Id</u>. at 219-25, 273-85, 302, 303-05, 335-42.

- plaintiff's appeal of the AC's denial of his claim for severance benefits.  <u>Id</u>. at 226-33.

- affidavit of Desi Stoops.  <u>Id</u>. at 234-38.

- side-by-side comparison of plaintiff's duties with WilTel and Level 3 prepared by plaintiff.  <u>Id</u>. at 239-42.

- internal guidelines for WilTel employees on pricing authority.  <u>Id</u>. at 243-65.

- transcripts of the AC's interviews with Tomae and McAndrews.  <u>Id</u>. at 289-301.

- notes from the AC's meetings reviewing plaintiff's appeal.  <u>Id</u>. at 307-10.

- transcript of second interview given by Russo on January 17, 2007 and attached exhibit.  <u>Id</u>. at 311-12.

- letter from AC to plaintiff denying his appeal.  <u>Id</u>. at 315-18.

While it appears that AC investigated plaintiff's claim in good faith and it attempted to gather relevant evidence, much of the evidence cited by the AC is not part of the administrative record. Defendants rely heavily on Resler's notes from her interviews with Russo, McLaughlin, and Savill

and Resler's subsequent summary of those interviews in her letter denying plaintiff's claim for severance benefits. Id. at 195-99; 203-10. However, Resler's handwritten notes and her summaries are of no assistance to this Court when reviewing defendants' decision. Without transcripts of the interviews or clear notes describing Russo, Savill, and McLaughlin's statements, the Court would simply be speculating if it affirmed the AC's decision on the basis that plaintiff's duties with Level 3 were "narrower but deeper" than his duties with WilTel. Although the transcripts of the AC's interviews with Tomae and McAndrews are helpful to determine plaintiff's duties with WilTel, they provide the Court no guidance on plaintiff's duties with Level 3. See id. at 293 (Tomae denies that he has "any insight into [plaintiff's] role at Level 3 after the acquisition"); id. at 298 (McAndrews acknowledges that he did not work for Level 3 and his knowledge of plaintiff's position at Level 3 comes from plaintiff's descriptions only). The Court recognizes that the AC's decision on this type of benefits claim is highly subjective, but the AC's decision must still be supported by substantial evidence in order for the Court affirm the AC's decision.

Many of the factual assertions made by plaintiff can not be supported by reference to the administrative record. Plaintiff presented a significant amount of evidence about his duties during his employment with WilTel, but plaintiff has not clearly identified what his duties were with Level 3. The Court understands that it may be difficult for either party to provide objective evidence about plaintiff's duties at Level 3, because plaintiff had his position as director of metro services less than three weeks before he gave his notice of good reason event. However, plaintiff had to prove that his new position with Level 3 was a "material adverse diminution." Id. at 44. He can not simply cite a lack of evidence, in part, caused by his own actions as a basis for the Court to overturn the

AC's decision.[12]  Plaintiff relies heavily on transcripts of interviews with Tomae and McAndrews to establish what his duties were at WilTel, but both Tomae and McAndrews acknowledged that they could not offer any evidence about plaintiff's duties at Level 3.  Admin. Rec. at 293, 298.  The primary source of evidence concerning plaintiff's duties with Level 3 is a memorandum that he prepared comparing his duties with WilTel and Level 3.  Id. at 66-67.  The memorandum is not accompanied by any evidence describing plaintiff's duties at Level 3 nor was the AC required to defer to plaintiff's assessment of his duties.

However, the Court finds that the AC's decision to deny plaintiff's claim for severance benefits was not supported by substantial evidence.  The administrative record does not contain important evidence relied upon by the AC when making its decision, and this has inhibited the Court's review of the AC's decision to deny plaintiff's claim for severance benefits.  There is no objective evidence clearly identifying plaintiff's duties at Level 3, and the Court would simply be speculating if it determined that a good reason event had occurred.  Given the problems with the administrative record and gaps in the evidence presented by both parties, the Court has no choice but to remand the case to the AC for further proceedings.  Remand is proper in cases where procedural deficiencies in the administrative process preclude the court from reaching the substantive issues underlying plaintiff's claim.  DeGrado v. Jefferson Pilot Financial Ins. Co., 451 F.3d 1161, 1175-76 (10th Cir. 2006) (district court should remand when plan administrator commits a procedural error but evidence in the administrative record could reasonably support the denial of

---

[12]     Under the terms of the Plan, plaintiff is correct that he could resign at any time based on a good reason event.  Dkt. # 40, at 27.  However, his decision to resign so quickly after moving into his new position complicated the AC's review of his claim and, as the Court has discovered, has limited the evidence for the Court to consider when performing a side-by-side comparison of his positions with WilTel and Level 3.

benefits); <u>Caldwell v. Life Ins. Co. of North America</u>, 287 F.3d 1276, 1288-89 (10th Cir. 2002) (remand to clarify record only unnecessary when the administrator's actions were arbitrary and capricious or "the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground."); <u>Panther</u>, 380 F. Supp. 2d at 1210 (shortcomings in the administrative record should be remedied by remand rather than award of benefits). The Court does not find that the case is so clear cut that remand would be futile and the proper remedy is to remand the case for further administrative proceedings.

The Court has two purposes in remanding the case to the plan administrator. First, the parties should supplement the administrative record with objective evidence, such as interview transcripts, job descriptions, and any other evidence upon which this Court could review when ruling on plaintiff's ERISA claim. If the AC intends to rely on the testimony of Russo, Savill, and McLaughlin, it must record their testimony in such a way that a reviewing court could consider this evidence. The parties should also focus on clarifying plaintiff's duties with Level 3. Second, defendants are directed to conduct a full redetermination of plaintiff's claim for severance based on the revised administrative record. It would make little sense to remand the case for supplementation of the administrative record without giving the AC a chance to review its previous decision. If, after supplementation of the administrative record and a redetermination of his claim, the AC upholds its denial, plaintiff may move to reopen his ERISA claim in this Court.

**IV.**

The parties have filed a Joint Motion for Stay of Plaintiff's State Law Claims (Dkt. # 54). The Court has reviewed the motion and plaintiff's complaint, and agrees with the parties that the viability of plaintiff's claims concerning the retention award depend on the resolution of plaintiff's ERISA claim.  However, the Court's decision to remand plaintiff's claim for severance benefits has changed the landscape of the case, and the Court believes that a supplemental settlement conference would be beneficial.  Therefore, the Court will set a settlement conference before Magistrate Judge Paul J. Cleary for resolution of all claims raised by plaintiff.  If the settlement conference is unsuccessful, the Court will address the joint motion to stay plaintiff's state law claims at that time.

**IT IS THEREFORE ORDERED** that plaintiff's claim for severance benefits is **remanded** to the plan administrator for supplementation of the administration record and a full and fair review of plaintiff's claim.

**DATED** this 22nd day of January, 2008.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT